# EXHIBIT B

<u>**Exhibit B to Form DAB-101**</u>

**Affinity Care of Missouri LLC**
**d/b/a One Community Hospice**
**ALJ Appeal Number 3-14665522624**

**Reasons for Disagreement with the ALJ's Decision**

The Appellant, Affinity Care of Missouri LLC ("Hospice"), is appealing the unfavorable determinations in the decision dated August 19, 2025[1] ("Decision" or "Dec.") issued by Administrative Law Judge Gwenevelyn Hurley ("ALJ") in the above-referenced appeal following a telephonic hearing that took place on June 5, 2025 ("Hearing"). Specifically, the Hospice disagrees with the ALJ's denial of payment to the Hospice for its provision of hospice services to the five (5) beneficiaries (collectively, "the Beneficiaries") on the specific dates of service for which review is requested, as set forth in Exhibit A to Form DAB-101 ("Denied Dates"). The Hospice takes exception to those unfavorable determinations in the Decision ("Unfavorable Determinations") for reasons including, but not limited to,[2] the following:

1.      <u>**The Unfavorable Determinations are contrary to the evidence and not supported by substantial evidence.**</u>

Contrary to the ALJ's Unfavorable Determinations, the administrative record contains ample evidence that meets the Hospice's burden to show, by a preponderance of the evidence, that the Beneficiaries were terminally ill and eligible for hospice services during the Denied Dates. The record includes the <u>**certifications of terminal illness**</u> signed by the hospice physicians who treated the Beneficiaries and attested in writing to their eligibility in real time, as well as <u>**medical records**</u> supporting the relevant certifications. The record also contains <u>**undisputed written and verbal expert medical opinion testimony**</u>[3] from Laura Patel, MD, FAAHPM, HMDC, an independent, board-certified hospice physician and certified hospice medical director ("Hospice Expert"), confirming that the Beneficiaries all had terminal prognoses during the Denied Dates. During the

---

[1] Although dated August 19, 2025, the Decision was not received until September 9, 2025 (see facsimile stamp on the top of each page of the attached Decision). Accordingly, this appeal is being timely submitted within the required 60-day timeframe. *See* 42 C.F.R. § 405.938(a) ("A party to a decision or dismissal issued by an ALJ or attorney adjudicator may request a Council review if the party files a written request for a Council review within 60 calendar days *after receipt* of the ALJ's or attorney adjudicator's decision or dismissal.") (emphasis added). *See also* 42 C.F.R. § 405.1102(a)(2) ("[T]he date of receipt of the ALJ's or attorney adjudicator's decision or dismissal is presumed to be 5 calendar days after the date of the notice of the decision or dismissal, *unless there is evidence to the contrary.*") (emphasis added).

[2] The Reasons for Disagreement with the ALJ's Decision as outlined herein include non-exhaustive examples of the errors committed by the ALJ in the Decision. The Hospice reserves the right to disagree with and take exception to additional findings made or conclusions reached by the ALJ, in the Decision (File 61) or during the Hearing (Files 58 and 59), for reasons not set forth within this Exhibit in future appeal submissions. Moreover, the Hospice's Redetermination Request dated March 13, 2024 (File 39), Reconsideration Request dated October 25, 2024 (File 44), Position Statement dated May 30, 2025 (File 57), and all attachments or exhibits thereto are hereby incorporated by reference, as they summarize the Hospice's position in this appeal.

[3] The Hospice Expert's curriculum vitae was included as an attachment to the Hospice's Response to the Amended Notice of Hearing dated April 4, 2025 (File 55). The Hospice Expert's written testimony was included as Exhibits A-B, D, and F-G to the Position Statement. During the Hearing, the Hospice Expert incorporated the content of her written testimony by reference into her sworn verbal testimony. Hearing Audio.

Hearing, the Hospice Expert testified based on her review of the records that it was reasonable for the Hospice's certifying physicians to conclude, at the time of each applicable certification, that the Beneficiaries had prognoses of six months or less if their illnesses ran the normal course. In addition, the Hospice provided an **expert declaration**[4] from the Hospice Expert explaining how experienced hospice physicians exercise clinical judgment by, among other things, applying local coverage determination ("LCD") guidelines, to assess beneficiary clinical eligibility for hospice services.

The great weight of evidence supports that the certifying physicians' determinations regarding prognosis were reasonable, and that the services the Hospice provided to the Beneficiaries during the Denied Dates were appropriate. Against this substantial evidence demonstrating the propriety of the claims, there is essentially nothing; the administrative record does not contain *any* medical opinion evidence from CMS or its contractors refuting the determinations made by the certifying physicians or contradicting the Hospice Expert's testimony. Yet, the ALJ—based upon her own unqualified clinical determinations, and contrary to the overwhelming evidence, including the clinical judgment of the certifying physicians and the Hospice Expert's uncontested medical opinion testimony—concluded that the Beneficiaries were not terminally ill. Accordingly, the Unfavorable Determinations are wrong in light of the complete administrative record and must be overturned, as they are not supported by substantial evidence, as explained below.

A. **The ALJ improperly made clinical inferences and reached medical conclusions regarding the Beneficiaries' prognoses without the knowledge, training, or experience necessary to engage in prognostication.**

While ALJs may weigh the evidence in the administrative record (including any testimony provided), they *may not* make independent medical findings based on their own interpretation of the medical records.[5] The applicable statute, regulation, and Medicare Benefit Policy Manual make clear that the initial certification and all recertifications require the exercise of a *physician's* clinical judgment.[6] It follows that *only a trained hospice physician* is competent to evaluate the reasonableness of other hospice physicians' eligibility determinations. In other words, non-physician ALJs are not and should not be permitted to reach clinical conclusions without the aid of medical opinion testimony from a qualified expert. The only qualified hospice expert appeared and testified on behalf of the Hospice (Dec. p. 2); no one from the Centers for Medicare and Medicaid Services ("CMS") or its contractors appeared at the Hearing. Yet, the Unfavorable Determinations reveal the ALJ relied on her own interpretation of the medical records, resulting in an inaccurate assessment of the Beneficiaries' prognoses and, therefore, flawed conclusions regarding their hospice eligibility and the necessity of the services they received. *See generally*

---

[4] *See* Exhibit J to the Hospice Position Statement. The Hospice Expert also incorporated the content of her declaration by reference into her sworn verbal testimony. Hearing Audio.

[5] *See, e.g.*, *Hospice of E. Tex. v. Sec'y, U.S. Dep't of Health & Hum. Servs.*, 2025 WL 957519 (E.D. Tex. 2025) (adopting Report and Recommendations of Mag. J., Docket No. 31).

[6] *See* 42 U.S.C. § 1395f(a)(7) and 42 C.F.R. § 418.22(b) (requiring an individual's prognosis to be based on a *physician's* clinical judgment); *see also* Medicare Benefit Policy Manual ("MBPM"), CMS Pub. No. 100-02, Ch. 9, § 10 ("No one other than a medical doctor or doctor of osteopathy can certify or re-certify a terminal illness."); Hospice Care Amendments, 70 Fed. Reg. 70532, 70539 (Nov. 22, 2005) ("It is the physician's responsibility to assess the patient's medical condition and determine if the patient can be certified as terminally ill.").

Dec. pp. 17-21, 27-32, 36-42, 46-53, 53-56; *see also, e.g.*, Dec. p. 21 (concluding without basis that Beneficiary E.E.'s weight loss "could have been due to depression/grief" and, therefore, does not support a terminal prognosis of six months or less). In the absence of medical opinion testimony that the services provided were not reasonable and necessary, the ALJ's clinical inferences and conclusions amount to nothing more than mere speculation.

   **B. The ALJ failed to evaluate the clinical judgment of the certifying physicians in the context of the complete administrative record, despite acknowledgment by Congress and CMS that the certifying physician's role is central to the Medicare hospice benefit.**

   The ALJ is not permitted to substitute her own layperson's opinion for that of the experienced hospice physicians who contemporaneously treated the Beneficiaries and certified them as terminally ill and hospice eligible. Although certifying physicians' determinations regarding terminal prognosis are not entitled to presumptive weight, the ALJ was required to evaluate those determinations in the context of the evidence in the complete administrative record, including the Hospice Expert's unrefuted testimony corroborating the underlying certifications.[7]

   The Unfavorable Determinations here demonstrate the ALJ's unexplained disregard for the clinical judgment of the certifying physicians. *Even if* the ALJ were qualified to engage in prognostication (which she is not), the *post hoc* scrutiny of a certifying physician's clinical judgment is not enough to undermine that physician's prior hospice eligibility determinations. Rather, reversal of a certifying physician's hospice eligibility determination is appropriate *only if*, based on a reasonable interpretation of the relevant medical records, *no reasonable physician* applying his or her clinical judgment could have concluded that the beneficiary was terminally ill.[8] Nothing in the administrative record supports, nor does the Decision assert, that no reasonable physician could have deemed each Beneficiary eligible.

   **C. The ALJ improperly disregarded the Hospice Expert's unrebutted medical opinion testimony about the prognostic significance of the Beneficiaries' many well-documented debilities, diagnoses, and symptoms.**

   Expert testimony is intended to clarify and contextualize the clinical judgment applied by the certifying physicians based on the information available at the time of certification, as documented in the medical records.[9] The ALJ acknowledged the Hospice Expert's appearance at

---

[7] *See Hospice of E. Tex.*, 2025 WL 957519, at *8 ("While controlling weight need not be given the opinions of treating physicians, such opinions are nevertheless entitled to consideration on a Medicare determination, particularly if there is no physician evidence to the contrary.").

[8] *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296 (11th Cir. 2019) ("[Two] physicians applying their clinical judgment about a patient's projected life expectancy could disagree, and neither…be wrong.... Nothing in the statutory or regulatory framework suggests that a clinical judgment regarding a patient's prognosis is invalid or illegitimate merely because an unaffiliated physician reviewing the relevant records after the fact disagrees with that clinical judgment."); *see also United States v. Vista Hospice Care, Inc.*, No. 3:07-CV-00604-M, 2016 WL 3449833, at *17 (N.D. Tex. June 20, 2016).

[9] For example, at the Hearing, the Hospice Expert explained fundamental hospice clinical measures and their relationship to terminality, such as the Palliative Performance Scale ("PPS"), the Functional Assessment Staging Tool ("FAST"), activities of daily living ("ADLs"), mid-arm circumference ("MAC"), and more. Hearing Audio. She also

the Hearing (Dec. p. 2) and paraphrased certain portions of her testimony. However, the Unfavorable Determinations in the Decision reveal that the ALJ ultimately disregarded the Hospice Expert's medical opinions, instead relying on her own layperson's understanding of the records to conclude that the Beneficiaries were not terminally ill. Summarizing the Hospice Expert's medical opinion testimony, as the ALJ did here, *does not* demonstrate the requisite consideration of that testimony, particularly given that the ALJ did not provide *any* analysis of or response to the information or conclusions presented therein.[10] By failing to consider that medical expertise, the ALJ overstepped the bounds of a lay person's competence in coming to her conclusions.

The Unfavorable Determinations do not explain *why* the ALJ disagreed with the Hospice Expert's medical opinions, despite the fact that no competent witness rendered a clinical assessment contrary to that of the Hospice Expert. CMS and its contractors are permitted by regulation to appear at hearings, as a participant or party, to provide medical opinion evidence on behalf of CMS.[11] However, nobody from CMS or its contractors attended the Hearing or provided contrary medical opinion evidence.[12] The ALJ referenced the qualified independent contractor's ("QIC's") conclusions in her discussion of each Beneficiary (Dec. pp. 17, 27, 37, 46, 56), but the underlying decisions issued by CMS contractors are *not* medical opinion evidence. They were written by unidentified individuals with unknown credentials who were neither personally involved in the care of the Beneficiaries (like the certifying physicians), nor under oath or subject to cross-examination (like the Hospice Expert). To the extent that any of the underlying reviewers were not physicians, they were not competent to determine, based on a review of the medical records, what a reasonable physician would or would not conclude based on each Beneficiary's unique clinical circumstances. Because the underlying decisions and the rationales expressed therein do not constitute medical opinion evidence, they cannot be relied upon by the ALJ to refute the determinations made by the certifying physicians or the Hospice Expert. *Even if* the underlying reviewers were physicians, the ALJ failed to provide any explanation of why their opinions were seemingly credited over that of the qualified Hospice Expert who appeared at the Hearing.

At no point during the Hearing or in the Decision did the ALJ question the Hospice Expert's credibility or provide a reasoned basis for disregarding the Hospice Expert's conclusions about the Beneficiaries' terminality in favor of her own.[13] For each Beneficiary, the ALJ concluded matter-of-factly—without sufficient explanation or evidentiary support, and without rebutting or giving

---

interpreted certain specific clinical information in the medical record and described the significance of that information in the complex context of hospice medicine. *Id*.

[10] The ALJ also failed to engage with the Hospice Expert's written testimony, in which she provided a detailed, written explanation of the clinical significance of the information from the medical records and how, in her expert medical opinion, that information supported each Beneficiary's hospice eligibility. *See* Exhibits A-B, D, and F-G to the Hospice's Position Statement.

[11] *See* 42 C.F.R. § 405.1012.

[12] Although 42 C.F.R. § 405.1010(a)(2) indicates there can be no adverse inference if CMS chooses not to participate, CMS's non-appearance nonetheless results in an absence of countervailing expert testimony on which an ALJ can rely. *See, e.g.*, *State v. Jimenez*, 160 Idaho 540, 544 (Idaho 2016) ("There is a difference between drawing an adverse inference and recognizing the lack of evidence" and that where defendant was not required to, but could have presented evidence, "the court could certainly take into consideration the lack of such evidence.").

[13] ALJs can reject uncontested expert opinions that are inconsistent, insufficiently explained, or contrary to the objective clinical evidence. However, the ALJ made no assertion that the Hospice Expert's testimony was any of the above.

any basis to discredit the Hospice Expert's contrary findings[14]—that "[t]he determination of 'terminal illness' is not supported by the evidence." Dec. pp. 21, 32, 41, 52, 56.

**2.**      <u>**The ALJ failed to apply the correct legal standards governing clinical eligibility for hospice services, and subsequent reviews of eligibility determinations, thereby rendering Unfavorable Determinations that are contrary to law.**</u>

When ruling on questions of evidence and making factual and legal determinations, ALJs must fully and independently examine the issues based on the complete administrative record to render an impartial decision in accordance with applicable law. ALJs are bound by the Administrative Procedure Act ("APA"), Medicare statutes and regulations, precedential decisions of the Medicare Appeals Council, rulings issued by CMS, and relevant case law. In this case, the ALJ incorrectly applied or altogether ignored several fundamental legal principles governing hospice eligibility determinations and the later evaluation of those determinations, as examined below. In doing so, she created a new, more stringent legal standard of which the Hospice had no notice, in violation of the rulemaking requirements of the Medicare Act and the APA.[15]

### A. The ALJ failed to apply or, alternatively, misapplied the local coverage determination guidelines.

LCDs set forth coverage indications (*i.e.*, clinical variables) that generally support a terminal prognosis to serve as "useful framework[s]" to assist in physician decision-making regarding eligibility.[16] Although meeting LCD guidelines demonstrates terminality, failure to meet LCD guidelines *does not* necessarily rule out terminality and, therefore, does not preclude hospice eligibility. In other words, although ALJs must—in "substantial deference" to LCDs under 42 C.F.R. § 405.1062(a)—approve claims whenever LCD guidelines are met, ALJs cannot deny claims simply because a Beneficiary does not meet LCD guidelines. The applicable CGS Administrators, LLC ("CGS") LCD guidelines for Hospice Determining Terminal Status (L34538) explicitly state that "[s]ome patients may not meet these guidelines, yet still have a life expectancy of six months or less. Coverage for these patients may be approved if documentation otherwise supporting a less than six-month life expectancy is provided." Therefore, if an ALJ concludes that a Beneficiary does not meet LCD guidelines, the ALJ must consider *all* prognostically relevant factors documented in the record, including those outside the confines of the LCD itself, before reaching a conclusion about clinical eligibility.

The application of the LCD to a particular beneficiary's circumstances is a complex clinical analysis that requires the appropriate medical knowledge, skill, and experience. For that reason, physicians are uniquely qualified determine—using their clinical judgment—what frequency,

---

[14] There is no rational connection between the facts found and the conclusions reached, *i.e.*, the decision to deny the Beneficiaries' claims. The ALJ's description of the Beneficiaries' conditions and disease progression based on the medical records actually *support* hospice eligibility.

[15] The APA allows agency findings, including ALJ decision, to be set aside if they are arbitrary and capricious (*i.e.*, demonstrate the application of incorrect legal standards).

[16] Medicare Program: Changes to the Medicare Claims Appeal Procedures, 70 Fed. Reg. 11419, 11458 (March 8, 2005). *See also* L34538 (stating the LCD guidelines "are intended to be used to identify any Medicare beneficiary whose current clinical status and anticipated progression of disease is more likely than not to result in a life expectancy of six months or less.").

severity, or combination of symptoms and conditions are "sufficient" to meet LCD guidelines or otherwise support a prognosis of six months or less. Part I of the LCD lists factors that are "predictive" of a terminal prognosis but recognizes that "[n]o specific number of variables must be met," and "[o]ther clinical variables not on th[e] list may support a six-month or less life expectancy." L34538. Therefore, although the enumerated variables *may* support terminality in certain clinical scenarios, a beneficiary does not need to demonstrate every variable listed to be eligible under Part I of the LCD guidelines, and other non-LCD factors can contribute to a terminal prognosis. In other words, the LCD guidelines are flexible and intentionally give certifying physicians leeway to exercise their clinical judgment. In fact, CMS has expressly rejected the idea that there are clinical "criteria" that must be satisfied to certify a hospice beneficiary as terminally ill.[17]

Despite the LCD's clear instructions, and without refuting (or even acknowledging) the Hospice Expert's testimony that the Beneficiaries actually did meet LCD guidelines under the first pathway,[18] the ALJ improperly expected the records to reflect *every LCD factor* in order to support terminality. Throughout the Decision, the ALJ acknowledged the Beneficiaries' numerous factors demonstrating decline in clinical status under Part I, but then denied the claims based on the alleged absence of *the other* enumerated LCD factors. Dec. pp. 21, 31, 41, 52, 56 (noting the absence of urinary tract infections, intractable infections, "significant" weight loss,[19] and/or stage three or greater pressure ulcers). Moreover, even when certain LCD factors were undeniably present, the ALJ ignored or minimized their impact on prognosis, erroneously concluding that those factors were somehow insufficient to meet the LCD guidelines, in direct contravention to the Hospice Expert's unrefuted medical opinion testimony. *See* Dec. pp. 21, 41, 52, 56 (stating that four of the Beneficiaries "did not have many of the signs and symptoms noted in LCD L34538" or "did not meet many of the requirements listed in the LCD.")

*Even if* the ALJ had the proper credentials to independently conclude or, alternatively, a sufficient evidentiary basis to support that the Beneficiaries did not meet LCD guidelines (which she does not), she was then required to consider all prognostically relevant factors documented in the record and presented in the Hospice Expert's testimony before determining the Beneficiaries were not terminally ill. Instead, the ALJ improperly treated the LCD guidelines as an absolute requirement, denying the Beneficiaries' claims solely because, in her own unqualified interpretation of the record and flawed, checklist-like application of the LCD, the documentation did not meet those guidelines. This misapplication of the LCD guidelines cannot stand.

---

[17] In 2008, CMS announced a rule specifying what hospice medical directors "must consider" when making an initial certification. *See* 42 C.F.R. § 418.102(b). CMS initially proposed labeling these considerations "criteria," but removed that word "in order to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness." *See* Medicare and Medicaid Programs: Hospice Conditions of Participation, 73 Fed. Reg. 32088, 32138 (June 5, 2008).

[18] *See* Exhibits A-B, D, and F-G to the Hospice's Position Statement. The Hospice Expert's written testimony included detailed descriptions of how each Beneficiary's condition met LCD guidelines (in paragraph and chart form). Specifically, the Hospice Expert testified (in writing and at the Hearing) that all five Beneficiaries met the Part I decline in clinical status guidelines. Hearing Audio.

[19] The ALJ provides no explanation as to what level of weight loss would be "significant."

**B. The ALJ failed to consider each Beneficiary's complete medical picture when evaluating the administrative record.**

Eligibility determinations, and subsequent reviews of those determinations, must take into consideration not just a beneficiary's diagnosis, but their *prognosis*. Although applicable law and guidance use varied terminology to describe prognosis (*e.g.*, whole condition, individual clinical circumstances, unique clinical picture, the total person, etc.), it is clear that prognosis derives from the combined effects of *all* a beneficiary's diagnoses, symptoms, and conditions (*i.e.*, the primary hospice diagnosis and all secondary or comorbid conditions, including those that are acute and chronic, whether controlled or uncontrolled). In this case, the ALJ repeatedly ignored or minimized many well-documented clinical factors that the certifying physicians and the Hospice Expert identified as supportive of a terminal prognosis.[20] As just one example, the ALJ's analysis of Beneficiary J.P. disregarded her recurrent urinary tract infections, unintentional weight loss of at least 8.5% of her bodyweight, 3cm decline in her MAC, recurrent pain, bradycardia, and risk of pressure ulcers due to immobility and nutritional decline. All these factors were identified by the Hospice Expert as supporting a terminal prognosis (Hearing Audio) yet overlooked or dismissed by the ALJ. *See* Dec. pp. 31-32. Instead, the ALJ focused on an alleged absence of pressure ulcers (despite the identified increased risk) and a "slight" improvement in weight in March 2023 as a basis to deny Beneficiary J.P.'s claims. The ALJ committed similar errors in her assessment of the other Beneficiaries' prognoses and hospice eligibility. *See, e.g.*, Dec. pp. 21, 41, 52, 56 (dismissing numerous documented factors supporting terminality and repeatedly concluding the Beneficiaries "appeared to have chronic conditions[21] which were being controlled with medication"[22] or "could have been [or were being] managed with custodial care"[23]).

Without describing the significance (or lack thereof) of the seemingly arbitrarily selected clinical data points referenced in the Unfavorable Determinations (many of which actually support, not refute, the Beneficiaries' terminal prognoses under the LCD guidelines and otherwise), the ALJ jumped to her ultimate conclusion that the Beneficiaries were not eligible. It is inconsistent with CMS directives for the ALJ to place undue weight on certain factors cherry-picked from the

---

[20] This includes factors both within and beyond the LCD guidelines.

[21] This comment incorrectly suggests that "chronic" and "terminal" are mutually exclusive. There is no doubt that the Beneficiaries had chronic diseases, but those diseases had progressed to the point at which the hospice physicians treating them felt, at each relevant certification, that they had six months or less to live if their illnesses ran the normal course. In other words, they were in the *terminal stages* of their chronic disease processes. Accordingly, the Beneficiaries were entitled to receive hospice care.

[22] The fact that a patient's symptoms respond to treatment or intervention does not negate the prognostic significance of those symptoms.

[23] The need for "custodial care" (or assistance with ADLs) does not preclude hospice eligibility. Hospice care is *skilled* care that is often provided alongside custodial care, as most terminally ill patients suffer from severe functional and/or cognitive debilities and, therefore, require assistance with some or all ADLs. For that reason, although the law prohibits payment for custodial care provided to non-hospice Part A beneficiaries, the Social Security Act § 1862(a)(9) includes an explicit exception in the case of hospice services. *See* Social Security Act § 1862(a)(9), indicating that "no payment may be made under part A…for any expenses incurred for items or services…where such expenses are for custodial care (*except, in the case of hospice care*, as is otherwise permitted)."

medical records while simultaneously ignoring or downplaying key information bearing on the Beneficiaries' overall conditions and, therefore, their prognoses.[24]

### C.  The ALJ improperly imposed a clinical "decline" requirement.

Nothing within the applicable statutes, regulations, or CMS guidance requires a decline in condition during each month of service, or even each benefit period, for a beneficiary to remain eligible for hospice services. To the contrary, CMS has acknowledged that not all beneficiaries will show measurable decline at each recertification.[25] Moreover, an apparent improvement or stabilization (*i.e.*, an apparent lack of decline) in a beneficiary's *symptoms* may not mean that their *prognosis*, on which hospice eligibility is based, has improved. Therefore, lack of decline or perceived stabilization during a single month or benefit period is not, in itself, a proper reason to conclude a beneficiary is not terminally ill. Despite this, the ALJ improperly denied the Beneficiaries' claims based on her own perceived lack of decline. *See, e.g.*, Dec. pp. 21, 32, 41, 52, 56 (repeatedly commenting that the documentation "did not support a trajectory of decline").

The ALJ's misplaced focus on decline is apparent based on, among other things, the following:

- The ALJ expected to see certain specific symptoms or declines that the Beneficiaries allegedly did not experience during the Denied Dates, irrespective of each Beneficiary's primary hospice diagnosis and unique clinical picture. *See, e.g.*, Dec. p. 56 (finding Beneficiary J.W. did not have a terminal prognosis because his "condition remained relatively stable over the period under review" despite evidence of increasing agitation, incontinence, and weight loss, and further citing to a lack of "significant changes in the plan of care" as a basis for denial). Depending on a particular Beneficiary's overall clinical circumstances, factors such as pain, stage three or four pressure ulcers, intractable infections, etc. *could* support a terminal prognosis if present. Contrary to the ALJ's suggestion, however, their absence does not demonstrate a lack of terminality (as described above).

- The ALJ further determined, without the proper qualifications or evidentiary support, that the declines that *were* documented in the medical record and addressed in the Hospice Expert's testimony were insufficient to support the Beneficiaries' hospice eligibility.

---

[24] *See* FY 2015 Hospice Wage Index and Payment Rate Update, 79 Fed. Reg. 50452, 50469 (Aug. 22, 2014) ("We…expect that the individual's whole condition plays a role in that prognosis.... All body systems are interrelated; all conditions, active or not, have the potential to affect the total individual. The presence of comorbidities is recognized as potentially contributing to the overall status of an individual and should be considered when determining the terminal prognosis."); FY 2014 Hospice Wage Index and Payment Rate Update, 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013) ("Eligibility under the Medicare Hospice Benefit is based on the prognosis of the individual and these criteria are not specific to or limited by any condition, multiple conditions or presence of comorbidities."). *See also Hospice of E. Tex.*, 2025 WL 957519, at *19 (overturning the ALJ's decision, in part, because it "improperly overemphasize[d] some considerations (*e.g.*, absence of decline discussed below) and underemphasize[d] other considerations (such as comorbidities identified in the medical records and by [the hospice's expert physician]))."

[25] Medicare Program; Hospice Wage Index for Fiscal Year 2010, 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009).

- The ALJ incorrectly interpreted any apparent stabilization as indicative of a change in prognosis and a lack of terminality, even when further decline was unlikely or not possible given the Beneficiary's condition or expected disease trajectory. As the Hospice Expert explained, however, a lack of decline in certain factors does not indicate ineligibility for hospice services.[26] CMS guidance and the applicable LCD indicate that Beneficiaries remain eligible for hospice care despite stabilization or improvement unless their overall condition changes to an extent "such that he/she no longer has a prognosis of six months or less."[27] Here, the administrative record contains ample support that any stabilizations in discrete symptoms referenced by the ALJ were the result of consistent, quality care provided by the Hospice that could not have been achieved or maintained outside of the hospice setting and *did not* indicate an improved prognosis or lack of terminality during the Denied Dates.

As a matter of *law*, claim denials based merely on the absence of decline are improper and contrary to the position of CMS and the appropriate interpretation of the Medicare hospice benefit. Moreover, as a matter of *fact*, claim denials based on the absence of decline, *when there actually was decline*, are improper as well.

3. **The ALJ failed to limit or waive the Hospice's liability as required under Sections 1879 and 1870 of the Social Security Act.**

The Hospice provided overwhelming evidence that it reasonably relied on the sound clinical judgment of its experienced hospice physicians that the Beneficiaries were terminally ill and eligible for hospice services. Accordingly, the hospice services provided were reasonable and necessary and should be paid by Medicare. However, even if the Hospice did not demonstrate the propriety of these claims (which the Hospice disputes), it is *still* entitled to payment pursuant to Sections 1879 and 1870 of the Social Security Act ("Act"). The ALJ failed to truly consider or properly apply the Act's limitation of liability and waiver provisions in this case. For example:

- The Decision does not include an analysis of the Hospice's liability for Medicare payments under Sections 1879 or 1870. Instead, the ALJ concluded matter-of-factly that, because the Hospice is a Medicare provider, it "knew or reasonably should have known that the services provided were not covered under Medicare guidelines[.]" *See* Dec. p. 11. The ALJ neglected to explain how mere knowledge of laws and guidance equates to knowledge that *these particular Beneficiaries* were not terminally ill. Prognostication involves the clinical judgment of a physician regarding the unique, complex clinical circumstances and expected disease trajectory of each individual beneficiary, *not* just the application of general "Medicare guidelines." Stated succinctly, "[i]t would be unfair to expect a hospice

---

[26] "A patient on hospice might have a palliative performance scale or PPS of 30%, and they may have that level for the entire time on hospice, and we wouldn't really expect them to decline any further because once they drop below 30%, it's really when they are in the active or transitioning phases of death and dying, so in the final days or weeks of life. The fact that they remain at 30% [throughout] their entire time on hospice doesn't really signify ineligibility." Hearing Audio.

[27] L34538 ("[P]atients in the terminal stage of their illness who originally qualify for the Medicare hospice benefit but stabilize or improve while receiving hospice care, yet have a reasonable expectation of continued decline for a life expectancy of less than six months, remain eligible for hospice care."). *See also* 70 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

to correctly predict how an ALJ would always rule in this uncertain and complicated area based simply on the receipt of non patient-specific material from CMS."[28]

- The ALJ's interpretation and application of the Act's limitation of liability and waiver provisions renders those provisions mere surplusage. It is irrational to believe that Congress enacted 1879(g)(2) with the intent that it could never be applied because the government publishes its laws and guidance materials. Similarly, if the mere fact that the Hospice is a Medicare provider was sufficient to put the Hospice on notice that these specific Beneficiaries' certifications of terminal illness were somehow unreasonable, the 1870 waiver would be completely superfluous.[29]

- The Decision and the record as a whole fall far short of showing that the Hospice had reason to expect that the clinical judgment of the certifying physicians regarding the Beneficiaries' terminal prognoses was likely to be rejected, or that the Hospice was unreasonable in accepting payment for the services provided. The Hospice is entitled to payment under Sections 1879 and/or 1870 because the overwhelming evidence demonstrates it did not and *could not* have reasonably been expected to know that the Beneficiaries would later be determined not to be terminally ill, and it is without fault because it had a reasonable basis for assuming payment was correct.[30]

---

[28] *Hospice of E. Tex.*, 2025 WL 957519.

[29] *See id.* (noting a conclusion that Section 1870 does not apply because the Hospice is "a participating provider in the Medicare program" is insufficient because "Section 1870 would be essentially null and void because presumably only Medicare providers would be applying for waiver of recoupment.").

[30] The ALJ provided no analysis regarding, and cited no evidence supporting, that the Hospice is not "without fault" or did not exercise reasonable care in billing the subject claims. *See* Dec. p. 11.